

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV 14   AM 7: 46

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

SHELITA WAKER for M.W.                         CIVIL ACTION

VERSUS                                         NO. 04-2887

JO ANNE B. BARNHART,                           SECTION "S"(3)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

### REPORT AND RECOMMENDATION

Plaintiff, Shelita Waker, seeks judicial review, pursuant to 405(g) of the Social Security

Act, of the final decision of the Social Security Administration denying her claim for

supplemental security income (child benefits) under Sections 1602 and 1614(a)(3)(A)of the Social

Security Act and finding that the child claimant (M.W.) was not disabled at any time through the

date of decision.[1]  This matter was referred to the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).  Plaintiff's appeal was submitted on

cross-motions for summary judgment, together with the Administrative Record of proceedings

before the Commissioner.  The general issue addressed by the Commissioner is whether the

claimant was disabled within the meaning of the aforesaid Act.  The review of the undersigned

Magistrate Judge concerns whether the correct legal standards were employed and whether the

---

[1]*See* Decision of ALJ Charles W. Kunderer dated February 20, 2004 [Adm. Rec. 15-23].

1

___ Fee _____
___ Process _____
 X  Dktd _____
___ CtRmDep _____
___ Doc. No. _____

final decision of the Commissioner is supported by substantial evidence.[2]

Considering the memoranda, administrative record, and the applicable law, for the reasons set forth in the captioned report below, the undersigned United States Magistrate Judge RECOMMENDS that the Commissioner's cross-motion for summary judgment be GRANTED and that the plaintiff's motion for summary judgment be DENIED.

## I. PROCEDURAL BACKGROUND

The child claimant (M.W.) was six (6) years old at the time of the administrative hearing.[3] On February 25, 2003 , the child's mother, Shelita Waker ("Waker"), applied for Supplemental Security Income (child benefits) on M.W.'s behalf claiming disability since his date of birth (September 26, 1997) due to a speech impairment and Attention Deficit Hyperactivity Disorder ("ADHD") which sometimes caused the claimant to have frequent temper tantrums, use profanity and become violent.[4]  Plaintiff's application was denied and she timely requested a hearing before an administrative law judge.[5]   Waker indicated that she disagreed with the determination because M.W. was diagnosed as "Bipolar I" and was unable to function without his medication.[6]

---

[2]*See Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002).

[3]*See* Transcript of Administrative Hearing dated December 18, 2003 [Adm. Rec. 34-51].

[4]*See* Application for Supplemental Security Income dated February 27, 2003 [Adm. Rec.61]; Child Disability Report dated 1/13/03 (noting that M.W. requires constant supervision and attends Cathedral of St. Louis King of France School because of the classroom teacher/student ratio) [Adm. Rec. 71].

[5]*See* Disability Determination dated May 23, 2003 [Adm. Rec. 52-56]; Request for Hearing dated July 17, 2003 [Adm. Rec. Exh. 2B].

[6]Request for Hearing dated July 17, 2003 [Adm. Rec. 57/ Exh. 2B].

Pursuant to the December 18, 2003 Administrative Hearing,[7] the ALJ determined that M.W. has ADHD, "which is 'severe' within the meaning of 20 C.F.R. § 416.924(c) and Social Security Rulings 96-3p and 85-28 because the child has more than slight abnormalities and more than minimal functional limitations."[8]  However, the ALJ found that the child's ADHD does not meet or medically equal the severity of any impairment listed in Part B of Appendix 1 to Subpart P.[9]  The ALJ found "no limitations" in five domains of functioning and less than marked limitation in one domain, *i.e.*, interacting and relating to others.  Concomitantly, the ALJ found no evidence of either "marked" or "extreme" limitation in any functional domain.[10]   ALJ Kunderer explained his findings in part as follows, to wit:

> A Teacher's Questionnaire was completed by claimant's teacher on April 28, 2003. She indicated that claimant had no limitations in any functional domain other than interacting and relating with others.  When a topic of conversation is unknown to claimant, his speech is understood one-half to two-thirds of the time.  After repeating and/or rephrasing, almost all of his speech is intelligible.   Claimant has slight problem in knowing when to ask for help.  The teacher was not aware of the claimant taking any medication.  She also commented that claimant does not frequently miss school.
>
> Dr. Arthur Strauss treats claimant.  On November 26, 2003, he indicated claimant had ADHD.  However, his assessment of claimant's impairments to the marked degree are clearly not supported by objective evidence, but merely an opinion in an attempt to get benefits for his patient.  This opinion is not supported by clinical findings or test data.... (Exhibit 9F).[11]

---

[7]*See* Transcript of Hearing dated December 18, 2003 [Adm. Rec. 34-51].

[8]Hearing Decision dated February 20, 2004 [Adm. Rec. 16].

[9]*Id.* at 19.

[10]*Id.* at 19-22.

[11]*Id.* at 17-18.

Considered in light of all of the other evidence (which was discussed), the applicable law and regulations, the ALJ refused to assign controlling weight to the opinion of Dr. Strauss regarding listing-level severity.

Cognizant that appropriate consideration must be given relative to the opinions, evaluations and conclusions of the state's medical consultants under the provisions of SSR 96-6p, the ALJ accorded significant weight to Dr. Guidry's opinion [Exhibit 3F] that the claimant's impairments are "severe" but do *not* meet, equal or functionally equal any listing.

Listing 112.11A applicable to attention deficit hyperactivity disorder requires medically documented findings of marked inattention, marked impulsiveness and marked hyperactivity. In addition, section 112.11B requires marked limitations of functioning in an least two of the following areas: cognitive/communicative function, social function, personal function, or the function of maintaining concentration, persistence and pace. To summarize, the ALJ found:

> (1) no evidence of limitation in Domain I (acquiring and using information), noting normal development in reading/math readiness, language skills, written tasks art and music;
>
> (2) no evidence of limitation in Domain II (attending and completing tasks), noting that claimant functions well with medication, completes tasks, works independently and uses materials correctly;
>
> (3) less than "marked" limitations in Domain III (interacting and relating with others), noting that school records document that the claimant plays well with others, has friends, shares, takes turns and takes care of possessions of others in a classroom setting, however, plaintiff's mother reports temper tantrums/violent behavior when the claimant does not get his way which behavior is contradicted by his school records;
>
> (4) no evidence of limitation in Domain IV (moving about and manipulating objects), noting that the child has no physical abnormalities and that his fine and gross motor skills have developed;
>
> (5) no evidence of limitation in Domain V (caring for self), noting that the child feeds, dresses, bathes himself and does not require special accommodations either at home or in the classroom; and

4

(6) no limitations in Domain VI (health and physical well-being), noting no hospitalization or emergency room intervention, no significant medication or treatment regimen and performance in all age appropriate activities without restriction and concluding that claimant's limitations do not functionally equal a listing.[12]

On March 25, 2004, M.W. appealed the determination of the ALJ,[13] arguing that the ALJ erred in finding that the medical record did not support the treating physician's medical diagnosis and by failing to give controlling weight to the treating physician's (Dr. Strauss') medical assessment.[14]   On August 20, 2004, the Appeals Council denied the plaintiff's request for review.[15]   The plaintiff timely appealed by filing the captioned lawsuit.  The matter is ripe for review.

## II. CONTENTIONS OF THE PARTIES

Plaintiff claims that the ALJ committed reversible error by failing to find the claimant disabled under Listing 112.11 and by failing to credit the treating physician's medical assessment.[16]  Plaintiff highlights that the ALJ ignored a School Function Report completed by a school principal on January 8, 2004, who reported that the plaintiff's behavior in class was out-of-control, he was physically abusive with classmates and teachers and that such behavior resulted in numerous suspensions from school.[17]  Plaintiff argues that Dr. Strauss' medical assessment is

---

[12]*Id.* [Adm. Rec. 20-22].

[13]*See* Request for Review of Hearing Decision dated March 26, 2003 [Adm. Rec. 10-11].

[14]*See* Correspondence of Plaintiff's Counsel dated November 7, 2003 [Adm. Rec. 251].

[15]*See* Notice of Appeals Council Action dated August 20, 2004 [Adm. Rec. 4-7].

[16]20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.11 (ADHD); Plaintiff's Motion for Summary Judgment [Fed. Rec. Doc. No. 9].

[17]*See* Plaintiff's Memorandum in Support of Motion for Summary Judgment at p. 5 (citing the Administrative Record at pp. 170-172).

consistent with other evidence of record, including Dr. Dowling's diagnoses of ADHD and

Bipolar Disorder and Dr. Buras' diagnoses of ADHD, Major Depression with psychotic symptoms

and Conduct Disorder due to suspected sexual abuse.  Plaintiff further notes that powerful anti-

psychotic medications were prescribed to quell plaintiff's extreme behavior, to wit: Zoloft,

Adderall, Risperdal, Depakote, Seroquel and Wellbutrin.[18]  In summary, plaintiff contends that

the ALJ failed to comply with the applicable standard which requires that controlling weight be

given to the treating psychiatrist's medical assessment.

The Commissioner contends that the ALJ gave proper consideration to the opinion of Dr.

Arthur Strauss and correctly determined that the plaintiff was not disabled at any time through the

date of the decision.  The Commissioner highlights M.W.'s school records for the 2002-2003

school which report normal development and "A" and "B" marks in all of his classes, which is

indicative of above-average performance.  The Commissioner further notes that a teacher's

questionnaire completed April 28, 2003 states that M.W. had "no problem" in the domains of

acquiring and using information, attending and completing tasks, interacting and relating to

others, moving about and manipulating objects and caring for himself.  Regarding the January 8,

2004 school function report completed by a school principal indicating that M.W. was physically

abusive, the Commissioner notes that the principal's report in close proximity to the hearing and

at a time when plaintiff had stopped giving M.W. some of his medication prescribed by treating

physician, Dr. Dowling.  The Commissioner argues that Dr. Dowling's records reflect that M.W.'s

condition was controlled by medication when the prescribed treatment regime was accurately

followed.  In summary, the Government submits that the medical opinions of Drs. Dowling and

---

[18]*See* Plaintiff's Memorandum in Support of Motion for Summary Judgment at pp. 7-8.

Guidry, as well as the majority of the school reports, support the ALJ's finding that M.W. did not have a marked or extreme limitation in *any* domain. Therefore, the ALJ properly found that M.W. was not "disabled" within the meaning of the Social Security Act and the Commissioner's decision is supported by substantial evidence.

### III. ANALYSIS

### A. Standards of Review

The function of this Court on judicial review is limited to determining whether there is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.[19] "Substantial evidence" is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion.[20] The evidence must be more than a scintilla, but may be less than a preponderance.[21]

The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.[22] When applying the substantial evidence standard on review, the court must "scrutinize the record to determine whether such evidence is present."[23] If the Commissioner's findings are supported by substantial

---

[19]*See* 42 U.S.C. § 405(g); *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).

[20]*Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Spellman,* 1 F.3d at 360.

[21]*Id.*

[22]*See Arkansas v. Oklahoma*, 503 U.S. 91, 112 S.Ct. 1046, 117 L. Ed.2d 239 (1992).

[23]*Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001).

evidence, they are conclusive and must be affirmed.[24]   Alternatively, a finding of no substantial

evidence is appropriate if no credible evidentiary choices or medical findings support the

decision.[25]   The court may not, however, re-weigh the evidence, try the issues *de novo* or

substitute its own judgment for that of the Commissioner.[26]   In short, "[c]onflicts in the evidence

are for the Commissioner and not the courts to resolve." [27]

<h3 align="center">B. Childhood Disability Standards</h3>

To be considered disabled and eligible for supplemental income under the Act, "'[a]n

individual under the age of 18 is considered disabled ... if that individual has a medically

determinable physical or mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or which can be expected to last for a

continuous period of not less than 12 months.'"[28]

The regulations define the statutory term "marked and severe functional limitations" for

children as "a level of severity that meets or medically equals the severity of a listing in the

Listing of Impairments in Appendix 1 of subpart P of part 404 (the Listing)."[29]

---

[24]*See Watson v. Barnhart,* 288 F.3d 212, 215 (5th Cir. 2002).

[25]*See Boyd v. Apfel, 239 F.3d 698, 704 (5th Cir. 2001).*

[26]*Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir. 2000); *Masterson,* 309 F.3d at 272.

[27]*Masterson,* 309 F.3d at 272.

[28]*Harris v.  Apfel*, 209 F.3d 413, 418 (5th Cir. 2000)(citing PRAWORA § 211(a)(1)-(4); 42 U.S.C. § 1382c(a)(3)(C)(i)(West Supp. 1999)).

[29]20 C.F.R. §§ 416.902, 416.906, 416.924-926a.

Childhood disability claims are evaluated according to a three-step process.[30]  Under this process, the ALJ first determines if the plaintiff is engaged in any substantial gainful activity.[31] At step two of the process, the ALJ determines if the plaintiff suffered from a "severe" impairment (*i.e.*, one that causes *more than minimal* functional limitations).[32]

If the child suffers from a "severe" impairment or combination of impairments, the Commissioner determines whether the impairments meet or functionally equal an impairment listed under Appendix I to Subpart P, of Part 404.[33]  The ALJ evaluates age, functioning, and other factors in determining whether a child meets a listing.[34]  In order to meet the third prong of the childhood disability test – that the impairment or combination of impairments functionally equal the severity of a  listed impairment – the child must establish that he has a marked limitation in two broad areas of functioning, also known as "domains," or an extreme limitation in one domain.[35]  The domains used to assess childhood disability are: (1) Acquiring and using information; (2) Attending to and completing tasks; (3) Interacting and relating with others; (4) Moving about and manipulating objects; (5) Caring for himself; and (6) Health and physical well-being.[36]

---

[30]20 C.F.R. § 416.924.

[31]20 C.F.R. § 416.924(b).

[32]20 C.F.R. § 416.924(c).

[33]20 C.F.R. § 416.924(d).

[34]20 C.F.R. § 416.924a-c.

[35]*See* 20 C.F.R. § 416.926a.

[36]*See* 20 C.F.R. § 416.926a(b)(1)(i-vi).

In this case, the ALJ found that M.W. met the first two parts of the test, *i.e.*, he was not

working and his ADHD was a "severe" impairment; however, as to the third part, the ALJ

determined that M.W. did not suffer from ADHD or any mental illness to such a degree that met

or equaled the requirements of any listing, and thus he was not "disabled" within the meaning of

the Act.  As aforestated, this Court's inquiry is limited to a determination of whether there is

substantial evidence in the record to support the ALJ's findings and whether proper legal standards

have been applied.[37]

### C. Listing Error

Substantial evidence supports the ALJ's determination that M.W.'s condition does not

meet Listing 112.11 (Attention Deficit Hyperactivity Disorder) or listing level severity for any

mental illness.  Listing 112.11 for ADHD provides as follows:

> Attention Deficit Hyperactivity Disorder:
> Manifested by developmentally inappropriate degrees of inattention,
> impulsiveness, and hyperactivity.
> The required level of severity for these disorders is met when the requirements of
> both A and B are satisfied.
> A. Medically documented findings in all three of the following:
> 1. Marked inattention; and
> 2. Marked impulsiveness; and
> 3. Marked hyperactivity;
> B. For...children (age 3 to attainment of age 18), resulting in at least two of the
> appropriate age-group criteria in paragraph B2 of 11.02.[38]

Paragraph B2 lists the following age-group criteria:

> **a.** Marked impairment in age-appropriate cognitive/communicative function,
> documented by medical findings (including consideration of historical and other
> information from parents or other individuals who have knowledge of the child,

---

[37]*See Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 215.

[38]20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.11.

when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

**b**. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

**c**. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

**d**. Marked difficulties in maintaining concentration, persistence, or pace.[39]

The Court has reviewed the medical and other evidence of record and finds that the ALJ's summary of the medical evidence reiterated above is substantially correct. The Court further finds that while there is evidence indicating M.W.'s inattention, hyperactivity and impulsiveness, there is nonetheless substantial evidence in the record supporting the ALJ's conclusion that these do not rise to the level of "marked" limitations. The ALJ pointed to substantial evidence provided by M.W.'s treating pediatrician and psychiatrist, Dr. Floyd Buras and Dr. Patrick Dowling, indicating that M.W.'s condition was greatly improved as long as he was compliant with his medications.[40]

---

[39]20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.02B.

[40]*See* Dr. Floyd Buras' Follow Up Notes dated July 8, 2003 (noting "doing fine on medication") [Adm. Rec. 143]; Dr Floyd Buras' Follow Up Notes dated August 20, 2003 (reporting that "Mom stopped giving [M.W.] the Lamictal that Dr. Dowling prescribed") [Adm. Rec. 141]; Interval History dated June 26, 2003 (noting "No Problems in school," "Average Development compared to other children," and "continue Dr. Dowling's medication plan") [Adm. Rec. 144-145]; ADHD Outcomes Progress Report dated June 3, 2003 noting "violence decreased, concentration increased, psychotic symptoms decreased and stabilized mood swings" with prescription drug therapy Adderall XR, Risperdol and Depakote) [Adm. Rec. 146]; Dr. Patrick Dowling's Notes dated November 30, 2001 (stating that M.W.'s response to his medications at school is "Excellent ... made student of the week" and "patient well-behaved") [Adm. Rec. 117]; Dr. Patrick Dowling's Notes dated December 28, 2001 (noting that as long as M.W. takes his medication "he does fine" and that "when he comes off the medications he is violent") [Adm. Rec. 116]; Dr. Patrick Dowling's Assessment date February 15, 2002 ("'doing excellent in school'") [Adm. Rec. 115]; Dr. Patrick

The Commissioner correctly notes that Dr. Dowling treated plaintiff for approximately two years as compared to the relatively short period of treatment (*i.e.*, 3 months) by Dr.Strauss. Indeed, the regulations provide that greater weight should be accorded to the treating source "most able to provide a detailed, longitudinal picture of [claimant's] medical impairment(s)," because such a view of the claimant's progress over an extended period of time "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."[41]

Addressing plaintiff's argument that Dr. Strauss specializes in adolescent behavior and assuming that to be the case, the claimant was only six years old as of the date of the hearing and thus not an adolescent.[42] Therefore, Dr. Strauss' specialty in adolescent behavior should not factor into the analysis.

The applicable regulations further provide as follows, to wit:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

---

Dowling's notes dated December 11, 2002 (noting that M.W.'s compliance with prescription drug therapy was "good," no side effects, his response at school stellar in that he was "Student of the Week" and he was also "doing well" at home) [Adm. Rec. 109].

[41]20 C.F.R. § 404.1527(d)(2).

[42]*See Dorland's Illustrated Medical Dictionary*, at p. 31 (28th ed. 1994) (defining adolescence as referring to children ages 11 through 19 years of age); *Blakeston's Gould Medical Dictionary*, at p. 32 (4th ed.1979) (defining adolescence as the period of life extending from puberty to maturity).

* * *

The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.[43]

The ALJ considered Dr. Strauss' listing assessments and accorded his opinions little weight, finding that his assessment of "marked" limitations in every domain inconsistent with other evidence of record and not well-supported by medically acceptable and laboratory diagnostic techniques. The ALJ specifically noted that he attempted to obtain additional information from Dr. Strauss to explain the inconsistencies between his cursory listing opinion and other evidence of record.[44]

ALJ Kunderer explained his findings regarding Dr. Strauss' records and supplemental evidence as follows:

[Dr. Strauss'] assessment of the claimant's impairments to the marked degree are clearly not supported by objective evidence, but merely an opinion in an attempt to get benefits for his patient. *This opinion is not supported by clinical finding or test data.* Even after requesting additional records after the hearing, *all that was submitted by Dr. Strauss was poorly legible letter and copies of prescriptions.*

In a form completed by Dr. Strauss in November 2003, he indicated [that] claimant had mood disorders and depressed symptoms consistent with depressed or irritable mood, psychomotor agitation or retardation, difficulty thinking or concentrating, hallucinations, delusions or paranoia, manic symptoms and had a bipolar or cyclothymic syndrome. *Further documentation was requested by the undersigned to support this assessment. While additional evidence was received after the hearing, it in no way supports this assessment or assumption Dr. Strauss has of claimant, and is discredited.*

In a letter by Dr. Strauss dated January 19, 2004, he indicates [that]

---

[43] 20 C.F.R. § 404.1527(d)(2) and (3)

[44] *See* ALJ Kunderer's Decision dated February 20, 2004 [Adm. Rec. 17]; Social Security Administration's Office of Hearings and Appeals Second Request for Records and Comments dated January 22, 2004 [Adm. Rec. 188].

claimant calls his mother vulgar words.  He feels bad when he can't get his way.
He indicated [that] claimant has trouble completing things at home and school, but
*this is second and third hand information and not based on first-hand information
or test results and clinical analysis.*[45]

The ALJ further noted that the state psychologist/consultant, Lawrence Guidry, Ph.D.

executed a "Functional Equivalence Evaluation, finding "no problem" in any one of the six

domains evaluated.  Dr. Guidry explained his finding of no limitations as follows:

Five year old male alleges speech and ADHD.  The claimant is treated for ADHD
by Dr. Dowling.  School ADLS shows no problems except for shyness.  His mom
did say that he does not function well without [his] medications.  He can get
violent.  Teacher indicates that his speech is not a significant problem.[46]

Additionally, the ALJ noted the questionnaire answered by M.W.'s kindergarten teacher

(Lydia Gagnard).  The questionnaire was provided by the state agency seeking information to be

considered in determining whether M.W. qualified for disability payments.  The form

questionnaire advised Ms. Gagnard that:

Your information is not the only information we will be considering when we
decide if the child qualifies for disability payments, but it is very important to us....
Under Social Security law, we are responsible for deciding whether this child is
disabled, and we will be making our decision based on all of the medical, school
and other information we get.  Your observations will help us to have a more
complete picture of the child's daily functioning and to make a fair and accurate
decision.[47]

Ms. Gagnard indicated that she has known M.W. for sixteen (16) months and observed him daily

during the nine-month school year, having taught him all subjects in a thirteen student

---

[45]ALJ Kunderer's Decision dated February 20, 2004 (italicized emphasis added) [Adm. Rec.
17].

[46]Dr. Guidry's Assessment dated May 22, 2003 [Adm. Rec. 134].

[47]Teacher Questionnaire [Adm. Rec. 118].

kindergarten classroom environment.[48] Ms. Gagnard noted "no problems" in any domain and that "functioning appears age appropriate," however, M.W. "is very shy."[49]

In reaching his determination that M.W.'s impairment did not functionally equal any listing, the ALJ assessed the plaintiff's limitations under the six functional domains in light of all evidence in the record, including that provided by Dr. Strauss. *Via* conclusory assessments dated November 26, 2003, Dr. Strauss determined that M.W. had "marked" impairment in literally every domain contrary to substantial evidence of record, including the treatment records of Drs. Buras and Dowling[50] and the opinion of state medical consultant Dr. Guidry. The ALJ commented at the time of the hearing that Dr. Strauss' information indicates that M.W. has every problem a child could possibly have and he had only been seeing Dr. Strauss for a couple of months.[51]

Dr. Strauss' medical/disability opinions are also contradicted M.W.'s academic performance and behavior in a normal classroom as reported by St. Louis Cathedral Elementary School. M.W.'s report cards uniformly indicate normal development in all spheres, including social, work/play habits, art, music, number and language development over the two year period of 2001/2002 (pre-kindergarten) and 2002/2003(kindergarten).[52] M.W. was promoted to the first grade.

---

[48]*Id.* [Adm. Rec. 120].

[49]*Id.* [Adm. Rec. 121-125].

[50]*See* Dr. Strauss' Listing 112.11 and Listing 112.04 Assessments dated November 26, 2003 [Adm. Rec. 162-167/Exh. 6F and 7F].

[51]*See* Transcript of the Administrative Record dated December 18, 2003 [Adm. Rec. 49].

[52]*See* St. Louis Cathedral School Records [Adm. Rec. 95-103].

Dr. Strauss' opinion that M.W. is "substantially disabled" and thus cannot learn in a normal school setting is also clearly contradicted by Dr. Dowling's/Buras' medical records. The aforesaid medical evidence indicates that M.W. was improved and stable on his medications as prescribed by Dr. Dowling. Even Dr. Strauss admitted that M.W.'s symptoms were partially under control at the time of his medical assessment. Most notably, Dr. Strauss did not state that M.W. was "disabled" or was expected to be "disabled" for a period of twelve months. Instead, his opinion was that M.W. was "substantially disabled *at this time* for learning in a normal school setting."[53] It is also clear on the record that medication adjustments were in progress at the time that Dr. Strauss executed the form listing assessment.[54]

The ultimate issue (disability) is reserved for the Commissioner and any conflicts in the evidence are for the ALJ to determine. The Commissioner correctly notes that the conclusory listing assessment stands in stark contrast to the opinions of other examining/treating specialists. An "Interval History" report dated June 26, 2003 clearly states that M.W.'s development as compared to other children is "average," he had no problems in school and his hobby was reading.[55] Dr. Buras' notes dated August 20, 2003 further state that plaintiff had stopped giving M.W. some of the medication previously prescribed by Dr. Dowling because M.W. was "doing fine on the other medications."[56] Despite plaintiff's allegations of a disabling speech impairment,

---

[53]*See* Dr. Strauss's Listing 112.04 Assessment dated November 26, 2003 (italicized emphasis added) [Adm. Rec. 167].

[54]*See id.* [Adm. Rec. 167].

[55]*See* Interval History dated June 26, 2003 [Adm. Rec. 144].

[56]*See* Dr. Buras' Progress Notes dated August 20, 2003 [Adm. Rec. 141].

the St. Louis Cathedral Report Card for the 2002-2003 school year states that M.W. made all A's

and B's, denoting above average progress academically in a normal school environment.  The fact

that compliance with prescription drug therapy resulted in marks indicating normal development

and above-average performance for the duration of claimant's pre-kindergarten and kindergarten

school years, respectively,[57] constitutes substantial evidence that the claimant's

condition/symptoms can be controlled with a closely followed course of prescription drug therapy.

Turning to the school principal's assessment of M.W.'s behavior/school performance, it

issued three weeks *after* the hearing and was provided to the ALJ together with (1) a post-hearing

memorandum, (2) copies of prescriptions (*i.e.*, Zoloft, Wellbutrin, Depakote, Adderall XR,

Risperdal, and Seroquel)and (3) Dr. Strauss's progress notes on M.W. for the period of October

31, 2003 to January 19, 2004.[58]   Principal Chavis indicated on the School Function Report that

she was not aware of any medication the child was taking or any special considerations or

assistance necessary to meet any special needs of the child.  Other than stating that M.W. was

hyperactive, Ms. Chavis provided no comments or additional information to help assess M.W.'s

ability to function in an age-appropriate manner.   Moreover, the principal's report is internally

inconsistent in that it states that M.W. "was suspended *on a few occasions*," but reports that

absences for only  two (2) days of school.[59]

---

[57]*See* Claimant's St. Louis Cathedral Catholic Elementary School Records [Adm. Rec. 99-102] .

[58]*See* Plaintiff's Post-Hearing Memorandum [Adm. Rec. 168-169].

[59]*See* Principal Vanessa J. Chavis' School Function Report dated January 8, 2004 (italicized emphasis added) [Adm. Rec. 169-172].

Plaintiff argues that the ALJ erred by not giving controlling weight to the opinions of

M.W.'s treating psychiatrist, Dr. Arthur Strauss, pursuant to SSR Ruling 96-2p.  The plaintiff is

legally incorrect to the extent she asserts that the ALJ *must* give "controlling weight" to the

treating physician's opinions, regardless of their lack of clinical support and the opinions'

inconsistency with other substantial evidence of record. The Fifth Circuit has recently held:

> The opinion of the treating physician who is familiar with the claimant's
> impairments, treatments and responses, should be accorded great weight in
> determining disability. A treating physician's opinion on the nature and severity of
> a patient's impairment will be given controlling weight if it is well-supported by
> medically acceptable clinical and laboratory diagnostic techniques and is not
> inconsistent with ... other substantial evidence. The opinion of a specialist
> generally is accorded greater weight than that of a non-specialist.
>
> Even though the opinion and diagnosis of a treating physician should be afforded
> considerable weight in determining disability, the ALJ has sole responsibility for
> determining a claimant's disability status. [T]he ALJ is free to reject the opinion of
> any physician when the evidence supports a contrary conclusion. The treating
> physician's opinions are not conclusive. The opinions may be assigned little or no
> weight when good cause is shown. Good cause may permit an ALJ to discount the
> weight of a treating physician relative to other experts where the treating
> physician's evidence is conclusory, is unsupported by medically acceptable clinical,
> laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.[60]

Thus, the Fifth Circuit in *Newton* concluded that, "absent reliable medical evidence from a

treating or examining physician controverting the claimant's treating specialist, an ALJ may reject

the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating

physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453 (emphasis

added).   ALJ Kunderer performed the requisite analysis regarding Dr. Strauss' November 26,

2003 functional assessment and twice requested further documentation and commentary to

---

[60]*Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir.2000) (quotations and citations omitted)
(emphasis added).

support Dr. Strauss' opinions, to little or no avail.

The Court further notes that, under the regulations, a treating physician is defined as a physician or psychologist "who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."[61]  Generally, an ongoing treatment relationship exists "when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required."[62]  "[T]he longer a treating source has treated [the claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the SSA] will give to the source's medical opinion."[63]  The SSA "will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability."[64]

As aforestated, Dr. Strauss first saw M.W. in October of 2003, *i.e.*, approximately two months before his social security hearing.  Three weeks later, Dr. Strauss executed a form listing assessments for ADHD ( Listing 112.11) and Mood Disorders (Listing 112.04), the purpose of which was to establish the severity of the M.W.'s condition for the pending December 18, 2003

---

[61] 20 C.F.R. § 416.902.

[62] *Id.*

[63] 20 C.F.R. § 416.927(d)(2)(i).

[64] 20 C.F.R. § 416.902.

Social Security hearing regarding the denial of SSI benefits.[65]

In the instant case, the ALJ had reliable medical evidence from an examining/treating psychiatrist, Dr. Dowling, who had treated M.W. for approximately two years. In contrast, Dr. Strauss had only treated the claimant for two months at the time of the administrative hearing. As the regulations explain, greater weight should be given to a treating source who is "most able to provide a detailed, longitudinal picture of [the claimant's] impairments...."[66] Relying on Dr. Dowling's and Dr. Buras' treatment records, as well as the evidence as a whole, ALJ Kunderer rejected Dr. Strauss' conclusory listing assessments, finding them unsupported and contradicted by substantial evidence of record.

Addressing the diagnoses of Bipolar I or possible Bipolar I, it is noteworthy that the listings are based on a claimant's *functioning*. Therefore, different diagnoses--without more--would not affect the ALJ's conclusions as to the level of M.W.'s impairment in a particular domain. Dr. Strauss' assessment of listing-level severity was specifically rejected by the ALJ for "good cause" in that it was conclusory and because the reports of other treating and consulting examiners and objective/clinical findings over the longitudinal history of M.W.'s treatment fail to support the plaintiff's claim of *listing level severity*.[67]

Social Security Regulations explain that no one piece of evidence is dispositive, to wit: "[W]e will not rely on any test score alone. No single piece of information taken in isolation can

---

[65]*See* Listing Assessments executed by Dr. Arthur Strauss on November 26, 2003 [Adm. Rec. 162-167].

[66]20 C.F.R. § 404.1527(d)(2).

[67]*Id.*

establish whether you have a 'marked' or an 'extreme' limitation in a domain ... We will consider your test scores together with the other information we have about your functioning, including reports of classroom performance and the observations of school personnel and others.[68]

In conclusion, Fifth Circuit law supports the Commissioner's contentions in that: (1) "good cause" to reject or discount the weight of a treating physician exists, where, as here, a treating source's (Dr. Strauss') statements are conclusory, not supported by clinical evidence or diagnostic test results and are otherwise inconsistent with the record evidence as a whole;[69]   (2) conflicts in the evidence are for the Commissioner, not the courts, to resolve; and (3) in the case of conflicting medical evidence as there is in this case, the Court must affirm the ALJ's determination where substantial evidence exists to support it.[70]  The ALJ complied with the applicable regulations and adequately explained his reasons for rejecting Dr. Strauss' opinion that the claimant was "disabled."   Therefore, substantial evidence supports the Commissioner's decision.

Accordingly and for all of the foregoing reasons,

**IT IS RECOMMENDED** that the final determination of the Commissioner denying the plaintiff's application for supplemental security income benefits be AFFIRMED and that the plaintiff's action be DISMISSED WITH PREJUDICE.

---

[68]20 C.F.R. § 416.926a(e)(4)(i-ii).

[69]*See Shave v. Apfel,* 238 F.3d at 595 ; *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995) (rejecting the conclusory statement of a treating physician when considered in conjunction with other opinions, objective medical evidence and other evidence of record).

[70]*See Masterson,* 309 F.3d at 272, 273.

## OBJECTIONS

A party's failure to written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 10th day of November, 2005.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**